## Dennis M. Ratigan and Michelle Ratigan, Appellants, v. K.D.L., Inc., doing business as Sundowner Bar, Appellee.

609 N.W. 2d 376

Filed April 21, 2000.   Nos. S-98-1193, S-98-1194.

William J. Pfeffer and Jeff T. Courtney, of Pfeffer, Streff & Courtney, for appellants.

J. Joseph McQuillan, of Walentine, O'Toole, McQuillan & Gordon, for appellee.

Hendry, C.J., Wright, Connolly, Gerrard, Stephan, McCormack, and Miller-Lerman, JJ.

Connolly, J.

Dennis M. Ratigan, Sr. (Dennis Sr.), was shot by a patron of the Sundowner Bar when he intervened in a brawl in the bar's parking lot. The appellants, Dennis Sr. and his wife, Micheline Ratigan, also known as Michelle Ratigan for these consolidated proceedings, sued the appellee, K.D.L., Inc., the proprietor of the Sundowner Bar, for negligence. The Ratigans claimed that K.D.L. was negligent in failing to take measures to prevent the shooting and to protect Dennis Sr. from harm. A jury found for K.D.L., and the Ratigans appeal. We affirm, because we conclude that there was sufficient competent evidence to support the jury's verdict.

## BACKGROUND

On the evening of September 14, 1993, the Ratigans went to the Sundowner. Dennis M. Ratigan, Jr. (Dennis Jr.), the Ratigans' son, was also present at the bar. That evening, Dennis Sr. and Dennis Jr. played a game of pool with two other bar patrons, Michael Ray Smith and Smith's companion. After Dennis Sr. and Dennis Jr. lost the game of pool to Smith and Smith's companion, Smith put Dennis Jr. in a headlock and rubbed his knuckles against Dennis Jr.'s head. This incident ended when Dennis Jr. ducked out of the headlock and told Smith to leave him alone. Shortly thereafter, Brian John Champion, the bartender, told Dennis Jr. that he would be "better off leaving." Dennis Jr. left.

When Dennis Sr. noticed Dennis Jr.'s absence, he became concerned and went to look for him. When Dennis Sr. saw that there was a fight going on in the parking lot, he ran outside and joined in, throwing people aside to get to Dennis Jr. Dennis Sr. testified that he tried to defuse the situation, but admitted to wrestling and fighting with Smith's companion after Smith's companion hit him. Approximately 3 to 5 minutes after the time that Dennis Sr. joined the fight, Smith went to his truck, got out a gun, and shot Dennis Sr. in the stomach.

## ASSIGNMENTS OF ERROR

The Ratigans assign as error the following: (1) the district court's entry of judgment based on the jury's verdict because the verdict was not supported by the evidence and was in direct opposition to the preponderance of the evidence and the controlling law and (2) the district court's overruling of the Ratigans' motion for directed verdict on the issue of liability because reasonable minds could draw but one conclusion and K.D.L.'s negligence should have been decided in the Ratigans' favor as a matter of law.

## STANDARD OF REVIEW

A civil verdict will not be set aside where evidence is in conflict or where reasonable minds may reach different conclusions or inferences, as it is within the jury's province to decide issues of fact. *Patterson v. City of Lincoln*, 250 Neb. 382, 550 N.W.2d 650 (1996).

■ A jury verdict will not be set aside unless clearly wrong, and it is sufficient if any competent evidence is presented to the jury upon which it could find for the successful party. *Id.*

■ With regard to the overruling of a motion for directed verdict made at the close of all the evidence, appellate review is controlled by the rule that a directed verdict is proper only where reasonable minds cannot differ and can draw but one conclusion from the evidence, where an issue should be decided as a matter of law. *Tapp v. Blackmore Ranch*, 254 Neb. 40, 575 N.W.2d 341 (1998).

## ANALYSIS

The jury returned a verdict in favor of K.D.L. It is not clear, however, whether the jury found for K.D.L. because the assault on Dennis Jr. was not reasonably foreseeable, or for some other reason. However, the evidence presented at trial was in conflict, and there was competent evidence upon which the jury could have found that the attack was not reasonably foreseeable. As such, there was sufficient evidence upon which the jury could find for K.D.L. We therefore affirm the verdict, which is not clearly wrong.

### HEADLOCK INCIDENT

At trial, Dennis Sr. described the headlock incident that followed the pool game as a little altercation between Smith and Dennis Jr.; Dennis Sr. testified that it concerned him and made him a little nervous, so he bought Smith a drink in an attempt to defuse the situation. On cross-examination, however, Dennis Sr. characterized this altercation between Smith and Dennis Jr. as "horseplay."

Micheline testified that she saw Smith put Dennis Jr. in a headlock and that it did not appear playful to her; she thought Dennis Jr. was getting hurt. However, she also testified that when Dennis Sr. bought Smith a drink, the altercation ended. On cross-examination, Micheline admitted that after Dennis Sr. bought Smith a drink, she did not hear any more noise or observe any other problems and that the whole incident had quieted down, as far as she knew.

Officer Joe Benak, the responding officer, testified that Champion, the bartender on duty the night of the shooting, told

him that Dennis Sr. and Dennis Jr. were playing pool with Smith and Smith's companion when an argument started. As the argument grew more heated, Champion asked Dennis Jr. to leave because he did not want a fight in the bar.

Champion testified, however, that he did not see Smith put Dennis Jr. in a headlock and that he did not know why Dennis Sr. purchased a beer for Smith and Smith's companion. A portion of Champion's deposition was then read into evidence in which Champion testified, "I noticed what was going on, and from what I seen was Michael Smith just antagonizing and messing with Denny, Jr." After the deposition was read, Champion admitted that he was concerned about the situation between Dennis Jr. and Smith. Since closing time was approaching, Champion asked Dennis Jr. to leave. Champion testified that he asked Dennis Jr. to leave rather than Smith because he knew that Dennis Jr. would listen to him and he did not want to cause any more problems than had already arisen. However, Champion knew of no physical confrontation involving Smith prior to the fight in the parking lot.

### BAN ON SMITH

At trial, the Ratigans attempted to elicit testimony from Champion and Keith Lang, of K.D.L., the Sundowner's owner, that Smith had previously been banned from the bar. Although the Ratigans attempt to make much of Champion's failure to enforce what they characterize as a ban on Smith, the evidence on this point is inconclusive. Champion admitted at trial that he knew Smith was not supposed to be in the bar but did not know the underlying circumstances; Champion knew only that at one point, there had been a problem with Smith of some sort, but he had never personally seen Smith cause problems. As for Champion's failing to enforce the ban on Smith, Champion testified that he relied on his own judgment because the ban did not necessarily mean that Smith was never to be in the bar.

Lang testified that on one occasion during the year preceding the shooting, Smith was in the bar arguing with his ex-wife and causing a commotion. Lang asked Smith to leave because the verbal argument was getting everyone excited, including the other customers. Lang testified, however, that he did not intend

to permanently ban Smith from the bar. When asked whether Smith had at any time displayed any violent tendencies, Lang responded, "No." On cross-examination, Lang did not agree that on the night of the shooting, Smith was not supposed to be in the bar. Rather, Lang testified that he told Champion to keep Smith out of the bar for a while after the fight between Smith and his ex-wife. Lang set no time limit on the ban; he trusted his employees to use their own judgment.

### SUNDOWNER'S GENERAL SECURITY

On cross-examination, Dennis Sr. admitted that before the night of the shooting, he had been going to the Sundowner for approximately 9 months to 1 year and had never had any trouble. He agreed that the bar could be described as "a neighborhood joint," where he felt safe and comfortable. Dennis Sr. admitted that he had no criticism of the bar's security, other than the fact that Champion allowed Smith to remain in the bar. Micheline admitted on cross-examination that up until the night of the shooting, she too felt that the bar was a good neighborhood place where she felt safe and comfortable.

On the night of the shooting, Dennis Sr. admitted that until he looked out the window, he had no idea there was a problem outside. There was no evidence of a gun when Dennis Sr. ran outside to intervene in the fight. From the time that someone yelled "He's got a gun" to the time that Dennis Sr. was shot, approximately 10 seconds had passed. Finally, Dennis Sr. admitted he had no evidence to suggest that Champion knew Smith had a gun on the evening of the fight.

A jury could conclude that the attack on Dennis Sr. was not reasonably foreseeable. The evidence presented at trial was clearly in conflict, and reasonable minds could have reached different conclusions or inferences based upon such evidence. No evidence was presented to show a history of violent acts occurring on the premises of the Sundowner, nor was evidence presented to show that Smith had previously displayed violent tendencies in the bar. The Ratigans attempted to present evidence that Smith had been banned from the bar because of a previous violent episode, but this evidence was refuted by Lang and Champion; Lang testified that he had asked Smith to leave once

because of a verbal argument with Smith's ex-wife. Lang did not intend, however, for that to be a permanent ban on Smith. Champion testified that he did not see Smith get physical with Dennis Jr.; rather, he had overheard an argument that, according to the Ratigans' testimony, apparently ended when Dennis Sr. purchased a beer for Smith and Smith's companion.

## CONCLUSION

It is within the jury's province to decide issues of fact. In light of the conflicting testimony at trial, the jury verdict is not clearly wrong and, therefore, will not be set aside. The conflicting evidence that supports the jury's verdict likewise supports the district court's overruling of the Ratigans' motion for directed verdict. The district court committed no error, and we, therefore, affirm.

AFFIRMED.